UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**,<br>Plaintiff,<br>v.<br>**DAVID BERNHARDT**, **SECRETARY OF THE INTERIOR**, ***et al.***,<br>Defendants. | Case No. 1:20-cv-00529 (TNM) |

**MEMORANDUM AND ORDER**

The Center for Biological Diversity ("CBD") sues to prevent the U.S. Fish and Wildlife Service from leapfrogging the Endangered Species Act's ("ESA") current mandates in its efforts to protect the Houston toad. The ESA requires the Service to develop and implement "recovery plans" that incorporate certain measures for the conservation and survival of all endangered species. CBD alleges that the Service has yet to develop such a plan for the endangered Houston toad. Defendants move to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. The Court denies the motion for the following reasons.

**I.**

The Houston toad, or the *Bufo houstonensis*, is "small- to medium-sized"—for a toad—with adult males ranging between 45-70 mm snout to vent and adult females ranging between 52-80 mm. Defs.' Mot. to Dismiss ("Defs.' Mot.") Ex. A ("1984 Recovery Plan") at 9, ECF No. 13-1.[1] Its upper side is "light brown (sometimes reddish) with a variable number of dark brown

[1] All page citations refer to the page numbers that the CM/ECF system generates.

to black spots," which "usually contain a single, or several fused, nonspinous warts." *Id.* Considered a "habitat specialist," the Houston toad prefers "deep sandy soils and forest cover that are near breeding pools." Compl. for Decl. & Inj. Relief ("Compl.") ¶ 18, ECF No. 1. Its mating call "consists of a long, high-pitched trill" and its release call consists of a "short, barely audible release vibration and an even shorter vocalized chirp." 1984 Recovery Plan at 10.

The Houston toad resides only in Texas. Compl. ¶ 18. It "historically ranged across the central coastal region of Texas." *Id.* ¶ 19. But despite its name, it began disappearing from the Houston area in the 1960's. *Id.* It was listed as an endangered species in 1970. *Id.* ¶ 20. And it remains so today.

The ESA seeks to protect all endangered species. Since 1988, Section 4(f) of the ESA provides that the Secretary of the Interior, through the Service, "shall develop and implement plans (hereinafter in this subsection referred to as 'recovery plans') for the conservation and survival of endangered species . . . , unless he finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1).[2]

As part of these "recovery plans," Section 4(f) states that the Service "shall" incorporate in each plan certain statutorily enumerated measures. *Id.* § 1533(f)(1)(B). These include "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* § 1533(f)(1)(B)(ii). The Service must also solicit and consider public comment before "final approval" and "implementation" of a "new or revised recovery plan." *Id.* § 1533(f)(4), (5). Section 4(f) requires a report every two years "on the status of efforts to develop and implement

[2] The Service has the "responsibility to develop and implement recovery plans for non-marine species." Compl. ¶ 9.

recovery plans for all species" and "on the status of all species for which such plans have been developed." *Id.* § 1533(f)(3).

In 1984—four years before the adoption of the current version of Section 4(f)—the Service issued the "Houston Toad Recovery Plan." *See* 1984 Recovery Plan. Its goal was to "improve the status of the Houston toad to the point that survival is secured and the species can be delisted." *Id.* at 31. The 1984 Recovery Plan outlined four remedial steps: (1) "protect its known populations and habitats," (2) "locate and protect additional natural populations and habitats," (3) "determine its taxonomic status with respect to other forms of *Bufo*," and (4) "introduce and establish self-sustaining wild populations on sites in its historic range." *Id.* at 31–32 (cleaned up). The Service has never supplemented or revised the 1984 Recovery Plan. Compl. ¶ 23.

In 2011, the Service conducted a 5-year review of the Houston toad. *See* Defs.' Mot. Ex. B ("2011 5-Year Review"), ECF No. 13-2. The review addressed "current threats to the species, existing conservation efforts, and the need for future conservation actions." *Id.* at 3. It concluded that the 1984 Recovery Plan "does not reflect the most up-to-date information on the species' biology, nor does it address all five listing factors that are relevant to the species." *Id.* at 4. It also found that the 1984 Recovery Plan contains no recovery criteria, and that a "Recovery Plan with updated, measurable, and objective criteria is needed." *Id.* Another 5-year review took place in 2018. *See* Defs.' Mot. Ex. C ("2018 5-Year Review"), ECF No. 13-3. This review confirmed that the Houston toad remains an endangered species and that the 2011 5-Year Review "remains an accurate reflection of the species current status." *Id.* at 1.[3]

---

[3] "In deciding a motion to dismiss, a court may . . . consider documents attached to or incorporated in the complaint." *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) (cleaned up). The Complaint incorporates by reference the 1984 Recovery Plan, the 2011 5-Year

CBD is a non-profit organization "dedicated to the protection of native species and their habitats through science, policy, and environmental law." Compl. ¶ 6. It sues "on its own institutional behalf and on behalf of its members," some of whom "regularly visit natural areas that are occupied by the Houston toad, and seek to observe or study the toad in its natural habitat." *Id.* ¶ 7. CBD alleges that these members "derive educational, scientific, recreational, spiritual, professional, and aesthetic benefits from these activities, and intend to continue to use and enjoy these areas in the future." *Id.* Defendants are David Bernhardt, in his official capacity as Secretary of the Interior, and Aurelia Skipwith, in her official capacity as the Director of the Service (collectively, the "Government").

CBD claims that the Service has "never developed a scientifically grounded and legally valid recovery plan for the Houston toad" in violation of the ESA, 16 U.S.C. § 1533(f), and Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Compl. ¶ 1; *see id*. ¶¶ 30–42. The Government moves to dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). That motion is ripe for adjudication.

**II.**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* And the court must "accept all of the factual allegations in the complaint

---

Review, and the 2018 5-Year Review. *See* Compl. ¶¶ 22–29. The Court therefore considers these documents in deciding this motion. *See Pueschel v. Chao*, 955 F.3d 163, 168 (D.C. Cir. 2020).

as true." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (cleaned up).

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). A court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but not "assume the truth of legal conclusions." *Id.*

The ESA's civil-suit provision authorizes a private party to sue "where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary." 16 U.S.C. § 1540(g)(1)(C). The lawsuit must "compel the Secretary to perform a nondiscretionary duty under § 1533." *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (cleaned up). Similarly, the APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

**III.**

**A.**

The Government did not challenge CBD's standing to bring this case. But the Court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). The Court thus

considers CBD's standing *sua sponte* before addressing the motion to dismiss. *See Lee's Summit, MO v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000).

A plaintiff must establish standing at each phase of litigation. *See Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016). The "determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." *Id.* (emphasis in original). So the "burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).

ESA's citizen-suit provision "expands standing to the full extent permitted under Article III of the Constitution and eliminates any prudential standing requirements." *See Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011). Thus, CBD need only meet the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. Here, that means associational standing because CBD sues "on behalf of its members." Compl. ¶ 7.[4]

"An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash.*

[4] CBD also sues "on its own institutional behalf." Compl. ¶ 7. But the Court need not consider organizational standing if CBD has associational standing. *See Sierra Club v. Perry*, 373 F. Supp. 3d 128, 141 n.7 (D.D.C. 2019).

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (cleaned up). The latter two requirements are easily satisfied here. And the Court need only briefly address the first.

To have standing, CBD's members must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). CBD establishes causation and redressability. *See* Compl. ¶ 7. But injury in fact is a closer call.

The Supreme Court teaches that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (cleaned up). Or if they "desire to use or observe an animal species, even for purely esthetic purposes." *Lujan*, 504 U.S. at 562–63.

CBD includes these allegations in its Complaint. It alleges that some of its members "regularly visit natural areas that are occupied by the Houston toad, and seek to observe or study the toad in its natural habitat." Compl. ¶ 7. And that they "derive educational, scientific, recreational, spiritual, professional, and aesthetic benefits from these activities, and intend to continue to use and enjoy these areas in the future." *Id.* The Court credits these allegations at the pleading stage. *See Lujan*, 504 U.S. at 561. But CBD will have to show more as its burden "grows heavier." *See Osborn*, 797 F.3d at 1063. Later, CBD must provide evidence verifying these allegations. *See Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (finding plaintiffs failed to prove standing at summary judgment stage after surviving dismissal on basis of their allegations alone).

Satisfied that CBD has sufficiently alleged associational standing to proceed for now, the Court turns to the Government's motion to dismiss.

**B.**

The Government moves to dismiss the ESA and APA claims for the same reason under Rules 12(b)(1) and 12(b)(6).[5] It argues that Section 4(f) of the ESA imposes no mandatory duty on the Service to revise the 1984 Recovery Plan for the Houston toad. Defs.' Mot. at 15, 20. And even if it did, the Government alternatively argues that the ESA and APA claims are untimely. *Id.* at 23–29. Both challenges fall short.

To succeed in its claims under the ESA and APA, CBD must identify a non-discretionary or "discrete agency action that [the Service] is required to take" but did not. *See Bennett*, 520 U.S. at 173; *Norton*, 542 U.S. at 64 (cleaned up). CBD alleges that the Service is statutorily required under Section 4(f) of the ESA to "develop and implement a legally valid recovery plan for the Houston toad," but it has continually failed to do so. Compl. ¶ 1; *see id.* ¶¶ 2, 31–35, 40–42.

The analysis of whether Section 4(f) creates this obligation starts and ends with its plain text. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."). The statute states that the Service "shall develop and implement" recovery plans "for the conservation and survival of endangered and threatened species . . . , unless [it] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). These recovery plans "shall, to the maximum extent practicable . . . incorporate in each plan" certain measures, including

[5] Because the Government raises the same argument under Rules 12(b)(1) and 12(b)(6), the Court considers them together.

"objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* § 1533(f)(1)(B)(ii). "The word 'shall' usually creates a mandate, not a liberty." *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018). Thus, the text of Section 4(f) is clear: All endangered species must have a recovery plan that incorporates the enumerated measures set forth in Section 4(f)(1).[6] *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1079 (D.C. Cir. 2017). CBD claims there is no such plan for the Houston toad. *See* Compl. ¶¶ 1–2, 31–35, 40–42.

The Government does not dispute this reading of Section 4(f). *See* Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") at 5, ECF No. 18; 2011 5-Year Review at 4. Instead, it tries to reframe the Complaint as a challenge to the Houston toad's 1984 Recovery Plan. *See* Defs.' Mot. at 17. Under the Government's characterization of the Complaint, Section 4(f)'s mandate, enacted in 1988, does not apply "retroactively" to pre-1988 recovery plans. That includes the 1984 Recovery Plan for the Houston toad. *See id.* at 17–19; Defs.' Reply at 5. And since the "ESA does not otherwise mandate that the Service revise existing recovery plans," the ESA and APA claims must fail. Defs.' Reply at 5.

The Government's argument is intriguing. And it appears to raise a matter of first impression in this Circuit.[7] But retroactivity is a red herring. The 1984 Recovery Plan does not

---

[6] The Government does not argue that a recovery plan is unnecessary to "promote the conservation" of the Houston toad. 16 U.S.C. § 1533(f)(1). Nor could it. The 2011 5-Year Review admits that "a recovery plan with updated, measurable, and objective criteria is needed" for the Houston toad. *See* 2011 5-Year Review Plan at 4; *see also* Compl. ¶¶ 24–26. So does the 2018 5-Year Review. *See* 2018 5-Year Review at 1.

[7] The D.C. Circuit's decision in *Friends of Blackwater v. Salazar* is not on point. 691 F.3d 428 (D.C. Cir. 2012). There, the court considered whether a recovery plan already created under the current version of Section 4(f) was binding in determining whether to remove a species from the endangered list. *See id.* at 432–34. CBD alleges that no such recovery plan exists for the Houston toad. *See* Compl. ¶¶ 1–2, 34–35, 40–41.

undergird CBD's Complaint. At this stage, the Court accepts CBD's allegations as true, not the Government's characterization of those allegations. *Banneker*, 798 F.3d at 1129. And the allegations state that the Service has "never developed a scientifically grounded and legally valid recovery plan for the Houston toad" under Section 4(f). *See* Compl. ¶¶ 35, 40–42; *see also id*. ¶¶ 1–2. These allegations are uncontested.

Indeed, even if the Court agreed with the Government that Section 4(f) has no retroactive effect on the 1984 Recovery Plan, CBD's allegations remain true. Section 4(f) creates a duty that the Service has failed to undertake. *See id*. ¶¶1–2, 34–35, 40–41. These uncontested allegations, accepted as true, state a claim under the ESA and APA and establish jurisdiction under the ESA's citizen-suit provision.[8]

The Government's retroactivity argument also is a misnomer. Retroactivity focuses on whether a statute imposes "new legal consequences to events completed before its enactment." *Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 753 (D.C. Cir. 2010). "Retroactive rules alter the past legal consequences of past actions." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (cleaned up). But a statute "does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994). Indeed, "[i]t is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes." *Chem. Waste Mgmt. v.*

[8] The Government's same arguments also failed elsewhere. Another court found that plaintiffs stated a claim under the ESA and APA despite the existence of a recovery plan enacted before 1988. *See Defs. of Wildlife v. Jewell*, No. CV-14-02472-TUC-JGZ, 2015 WL 11182029, at *7–8 (D. Ariz. Sept. 30, 2014).

*EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989).

For example, the D.C. Circuit rejected a retroactivity challenge to an FCC rule banning exclusivity agreements between cable companies and building owners that applied equally to already-existing exclusivity contracts. *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009). The court found that the new rule "purports to only alter the present situation, not the past legal consequences of past actions." *Id.* at 670 (cleaned up). While the FCC "impaired the future value of past bargains," it did not render "past actions illegal or otherwise sanctionable." *Id.*

Thus, under a retroactivity analysis, the Court would consider whether the Service is liable for the 1984 Recovery Plan's failure to comply with Section 4(f)(1) *before* 1988, when the new measures for recovery plans were enacted. But CBD does not purport to challenge the Service's conduct before 1988. *See* Pl.'s Opp'n to Mot. to Dismiss at 15, ECF No. 17. Nor is that the Government's challenge. Both parties focus on the "present situation." *Nat'l Cable & Telecomms. Ass'n*, 567 F.3d at 670. The Government's position is better construed as an argument that the 1984 Recovery Plan is *exempt* from the requirements of Section 4(f)(1). So the relevant question is whether the text of Section 4(f) exempts pre-1988 Recovery Plans. It does not.

To be sure, some statutes and regulations include provisions that exempt, or "grandfather," prior conduct or decisions from their prospective reach. *See, e.g.*, 25 C.F.R. § 292.26(a) ("These regulations do not alter final agency decisions made . . . before the date of enactment of these regulations."). Indeed, a different section of the ESA, Section 9, contains such a clause. *See* 16 U.S.C. § 1538. That section prohibits engaging in certain activities with endangered species, such as importing the species into the United States. *Id.* § 1538(a)(1)(A).

But it expressly exempts from its prohibitions species that were "held in captivity or in a controlled environment" either at the time the ESA was enacted or when the species was designated as endangered, so long as the holding is not for a "commercial activity." *Id.* § 1538(b)(1).

Section 4(f) contains no such clause. The fact that Congress chose to include express exemption provisions elsewhere in the ESA, but not here, is powerful evidence against the Government's interpretation. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

More, Section 4(f) does not otherwise "express any affirmative intent to grandfather" pre-1988 recovery plans from its mandate. *See Nat. Res. Def. Council, Inc. v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988). Quite the contrary. The so-called "procedural requirements" of Section 4(f) suggest that existing recovery plans are not exempted. They require the Service to solicit and consider public comments before "final approval" and "implementation" of a "new *or revised* recovery plan." *See* 16 U.S.C. § 1533(f)(4), (5) (emphasis added). Congress must have intended the new mandate of Section 4(f)(1) to apply equally to existing recovery plans. Otherwise, there would be no need to include procedural requirements for a "revised recovery plan" "prior to final approval." *See id.* § 1533(f)(4). The Court thus declines the Government's invitation to read Section 4(f) to exempt the 1984 Recovery Plan from its mandate.

CBD has thus stated a claim under the ESA and APA and established jurisdiction under the ESA's civil-suit provision.

**C.**

The Government also moves to dismiss the ESA and APA claims as time-barred. *See* Defs.' Mot. at 23–29. These claims are generally subject to a six-year statute of limitations. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action accrues").

Applying this statute, the Government offers three alternative deadlines for when the Complaint should have been filed but was not: 1990, six years after the 1984 Recovery Plan; 1994, six years after the enactment of the current version of Section 4(f); or 2017, six years after the 2011 5-Year Review Plan. *See* Defs.' Mot. at 24–25. CBD argues that the six-year limit does not apply because its claims are subject to the "continuing violation doctrine." The Court agrees with CBD.

The continuing violation doctrine is an exception to the general rule that a "claim normally accrues when the factual and legal prerequisites for filing suit are in place." *Earle v. District of Columbia*, 707 F.3d 299, 306 (D.C. Cir. 2012). The doctrine can apply if "the text of the pertinent law imposes a continuing obligation to act or refrain from acting." *Id.* at 307. Surveying its precedent, the D.C. Circuit explains that it has "repeatedly refused to hold that actions seeking relief under [the APA] to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred." *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006). The court in *Wilderness* cited two cases for this proposition: *In re United Mine Workers of America International Union*, 190 F.3d 545 (D.C. Cir. 1999), and *In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000).

In *United Mine Workers*, the D.C. Circuit declined to find a petition filed eight years after a statutory deadline untimely because the plaintiff "does not complain about what the agency has

done but rather what the agency has yet to do." 190 F.3d at 549. Similarly, *Bluewater Network* concluded that a petition challenging the Coast Guard's inaction nine years later was still timely because the Coast Guard was "faced with a clear statutory mandate" to establish compliance standards and "admitted to continuing recalcitrance." 234 F.3d at 1315–16 (cleaned up).

Based on this precedent, the *Wilderness* court in *dicta* found it "unlikely that plaintiff's complaint would be held by this court to be time-barred by 28 U.S.C. § 2401(a)" because plaintiff claimed the agency had "chronically failed to undertake various legal obligations with respect to the identification and management of 'wilderness' in the National Park System." 434 F.3d at 588 (cleaned up).

The Government argues that the continuing violation doctrine does not apply for two reasons. First, "there was a single date that this violation accrued" because CBD "challenges the substance of the 1984 Recovery Plan." Defs.' Mot. at 27. And second, the language of the 2011 5-Year Review "is sufficient to alert a 'reasonably prudent plaintiff' of a possible violation." *See id*. at 29. But both these arguments mistakenly assume again that CBD is challenging the 1984 Recovery Plan. It is not.

CBD claims that the Government has "never developed a scientifically grounded and legally valid recovery plan for the Houston toad" under Section 4(f). Compl. ¶ 35; *see id.* ¶¶ 1, 2, 41. The Complaint is not "about what the agency has done but rather about what the agency has yet to do." *United Mine Workers*, 190 F.3d at 549. CBD alleges that the Service was "faced with a clear statutory mandate" to enact a recovery plan incorporating certain measures for the Houston toad under Section 4(f), but it has continually failed to do so. *Bluewater Network*, 234 F.3d at 1316. These allegations trigger the continuing violation doctrine.

Neither party addressed whether Section 4(f) of the ESA "imposes a continuing obligation to act," an alternative basis to apply the continuing violation doctrine. *See Earle*, 707 F.3d at 306. It does. "Whether the obligation is continuing is a question of statutory construction." *Id.* at 307. Under Section 4(f), the Service "shall report every two years . . . on the status of efforts to develop and implement recovery plans" for all endangered species and "on the status of all species for which such plans have been developed." *See* 16 U.S.C. § 1533(f)(3). In requiring a periodic report, the ESA contemplates a continuing obligation for the Service to comply with Section 4(f). *See Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 45 (D.D.C. 2013).

Accordingly, CBD's claims are timely under the continuing violation doctrine.

**IV.**

For all these reasons, the Government's motion to dismiss is DENIED.

2020.08.20 10:50:54 -04'00'

Dated: August 20, 2020

TREVOR N. McFADDEN, U.S.D.J.